**THEO TORRES**
California State Bar No. 324059
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Email: Theo_Torres@fd.org

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 22-cr-01502-W |
| Plaintiff, | Hon. Thomas J. Whelan |
| v. | August 14, 2023, 9:30am |
| ISAIAH DOTSON. | **Mr. Dotson's Motion to Suppress Evidence** |
| Defendant. | |

I.  INTRODUCTION .................................................................................4

II.  STATEMENT OF FACTS ....................................................................6

    A.  The October Robbery. ..................................................................6

    B.  The Facial Recognition Search. ...................................................6

    C.  The January Robbery. ..................................................................7

    D.  The "Tower Dump" Court Orders. ...............................................7

    E.  The Georgia GPS Warrant. ..........................................................7

    F.  The Stingray Warrant. .................................................................7

    G.  The Arrest of Mr. Dotson. ............................................................9

    H.  The Cell Phone Warrant. ...........................................................10

I.     Procedural History. .................................................................12

III.   ARGUMENT .........................................................................13

    A.   The use of facial recognition software amounted to a warrantless search that produced an unreliable identification of Mr. Dotson. ..................................................................13

        i.    In the wake of Carpenter v. United States, courts have sought to maintain that degree of privacy against government that existed when the Fourth Amendment was adopted. ............................................................13

        ii.   Surveillance technology exposes the privacies of life to arbitrary power when it allows the government to amass location information. ..........................................16

        iii.  Technology creates "too permeating police surveillance" when it exceeds society's expectations of the government's capabilities and mines data not voluntarily exposed................................................................17

        iv.   The government impermissibly used facial-recognition technology to identify Mr. Dotson and retrace his past movements through geolocation data. .............................19

        v.    The use of facial recognition technology to retrace a person's physical movements is a search under *Carpenter*. ...........................................................20

            a.   Facial recognition exposes the privacies of life to arbitrary power...............................................21

            b.   Facial recognition technology promotes a too permeating police surveillance. ................................22

        vi.   Regardless, facial-recognition technology cannot provide the basis for obtaining Mr. Dotson's cell-site location information because the government has not verified its reliability. ...........................................................24

    B.   The government violated the Fourth Amendment when it obtained the cell-site location information of Mr. Dotson, and every other person who interacted with certain cell phone towers, without a warrant backed by probable cause. ..............28

        i.    Exposing Mr. Dotson's physical location through multiple tower dumps violated his reasonable expectation of privacy under *Carpenter*............................30

            a.   Tower dumps expose the privacies of life to arbitrary power...............................................31

            b.   Tower dumps foster "a too permeating police surveillance" by exceeding society's expectations of investigative capabilities and by utilizing data

2

involuntarily exposed to the world.............................32

    c.   The government needed a warrant to access cell-site location information that belonged to Mr. Dotson..................................................................33

    d.   The tower dump orders in this case demonstrate that tower dumps almost always are incurably overbroad because they cannot be backed by sufficient probable cause and particularity..............36

C.   The Stingray warrant was facially deficient because it failed to connect Mr. Dotson's present-day location with evidence of months-old robberies and was incurably overbroad...................40

    i.   Stingrays function by searching all surrounding cell phones, forcing them to disconnect from real cell towers and instead turn over their data to the Stingray. ............40

    ii.   Using a Stingray is a search because it forces phones to reveal private location and identity information without the owner's consent. ........................................42

    iii.   The warrant application here was facially deficient. ........44

        a.   Without the prior illegal searches, there would be no probable cause to believe Mr. Dotson was the robber.....................................................................44

        b.   Even assuming Mr. Dotson was the robber, his prospective California location could not be evidence of the retrospective Georgia robberies.......45

        c.   Probable cause aside, the warrant was facially overbroad and lacking particularity. .........................47

D.   Once arrested, Mr. Dotson never consented to the search of his car, and could not voluntarily consent as a matter of law because of the coercive environment of the traffic stop.............50

    i.   The body-cam footage shows that the officers entered Mr. Dotson's car before they could have possibly asked for his consent. ..............................................................50

    ii.   Voluntary consent was impossible as a matter of law because Mr. Dotson was surrounded by officers with their guns drawn and dog barking, separated from his partner, and handcuffed in a squad car............................51

E.   The warrants to search Mr. Dotson's cell phones were facially invalid because they relied on the habits of drug-dealers rather than robbers and authorized years of data seizure without meaningful limits. ................................................................54

    i.   Agent Gillis offered no reason to believe that robbers store evidence on their cell phones. ...................................54

ii.   The resulting warrant was grossly overbroad, lacked particularity, and amounted to a general warrant............56

a.   The warrant lacked adequate temporal limits. ........58

b.   The warrant contained no meaningful limits on what was subject to seizure........................................60

c.   The warrant added an uncharged offense without explanation or probable cause...................................61

IV.   CONCLUSION ....................................................................62

## I.   **INTRODUCTION**

This case, like few others, catalogs how the twenty-first century permits omnipresent surveillance. In October of 2021 and January of 2022, a group of unknown men robbed two postal workers in Georgia. Agents first identified Mr. Dotson as a suspect by plugging a gas station surveillance snapshot into a facial recognition software program. They then obtained warrantless "tower dump" court orders to approximate Mr. Dotson's movements at the time of the robberies. Finally, they sought a warrant to employ a cell-site simulator (also called a "Stingray") to home in on Mr. Dotson's precise location in Southern California.

Several months after the robberies, about a dozen local officers pulled over Mr. Dotson. Held at gunpoint and surrounded, Mr. Dotson was compliant at every step of the stop. Investigators ultimately seized ammunition in a pouch behind the car's front passenger seat. They also found four cell phones, which they later obtained warrants to search. There are five key problems with this investigation.

**First**, the use of facial recognition technology constituted a warrantless search. And, regardless, the government has provided no information to support the notion that the facial recognition technology used here could reliably identify anyone—let alone Mr. Dotson in particular. With no predicate showing of reliability, the automated identification of Mr. Dotson

cannot suffice for probable cause to arrest him.

**Second**, the "tower dumps" constituted a warrantless search of Mr. Dotson under *Carpenter v. United States*, 138 S. Ct. 2206 (2018). By searching unknown thousands of citizens' location history without their consent or probable cause, these court orders could not satisfy the Fourth Amendment's warrant requirement.

**Third**, the Stingray warrant was irreparably flawed. The warrant application lacked any rationale for tying Mr. Dotson's prospective California location data to robberies that occurred six months prior and on the opposite side of the country. Moreover, the resulting warrant was overbroad and lacked particularity because it authorized the seizure of countless bystanders' private data and interrupted their phone service.

**Fourth**, Mr. Dotson never consented to the search of his car because the body-worn camera footage demonstrates that the officers searched his car without his permission. And even if they had asked, Mr. Dotson could not voluntarily consent as a matter of law because the officers held him at gunpoint and vastly outnumbered him.

And **fifth**, the cell phone warrant affidavit failed to articulate why the phones were likely to contain evidence of robbery. Instead, the affiant agent only claimed that cell phones tended to contain evidence of *drug-dealing*. Without some nexus between the phones and the Georgia robberies, the magistrate should not have signed off on this search. And this warrant, too, lacked meaningful limits on the scope of what data could be seized, independently rendering it invalid.

Consequently, every step of this investigation violated the Fourth Amendment. For these reasons, Mr. Dotson requests that this court suppress the resultant evidence. He also requests an evidentiary hearing to resolve any material disputes of fact.

## II. <u>STATEMENT OF FACTS</u>[1]

### A. The October Robbery.

The first robbery took place on October 19, 2021, in a suburb of Atlanta, Georgia. Ex. A (Georgia GPS Application) at 2. A mailwoman informed investigators that two men accosted her while she delivered to an apartment mailbox. *Id.* One man brandished a gun and demanded that she turn over her belongings, including a USPS-issued gas card for her vehicle. *Id.* The mailwoman complied with the robbers' demands and they fled without incident. *Id.* at 2–3.

### B. The Facial Recognition Search.

The first lead came the next day. Investigators learned that the stolen gas card had been used at a Shell gas station about nine hours after the robbery. *Id.* at 3. The officers viewed surveillance footage from the gas station, which "depicted at least three people arriving in a silver sedan moments before the attempted transaction with the stolen USPS gas card." *Id.* Inspector Chris Zito "submitted the surveillance of the transaction for facial recognition through the Georgia Department of Driver's Services." *Id.* This unnamed facial recognition technology identified Mr. Dotson as one of the sedan's occupants. *Id.*

Two weeks later, investigators interviewed the mailwoman. They conducted a sequential lineup containing Mr. Dotson's driver's license photograph. *Id.* at 4. The mailwoman relayed that she was "40% sure" that Mr. Dotson was "involved in the robbery," but would like to see the rest of his body. *Id.* Investigators then showed the mailwoman a still-image from the Shell station, which increased her confidence in the identification to 80% certainty. *Id.*

---

[1] For the purposes of this motion, Mr. Dotson has relied in large part upon discovery provided by the government. He reserves the right to challenge this evidence if presented at trial.

### C. The January Robbery.

The second robbery took place on January 29 of the following year. The victim (another mailwoman) reported that a man "approached her from behind and pressed a gun against her lower back." *Id.* She surrendered her belongings to him and he fled in a black sedan. *Id.*

### D. The "Tower Dump" Court Orders.

Investigators sought cell tower records for both robberies. *See* Ex. B (2021 Application and Order for Cell Tower Records) and Ex. C (2022 Application and Order for Cell Tower Records). They obtained non-warrant court orders under 18 U.S.C. § 2703 to seize phone records from cell phone towers near the two robberies. *Id.* The tower returns indicated that a phone number registered to Janice Dotson communicated with the towers of interest. Ex. A at 4–5. A disabled vehicle report associated with the phone number listed the caller's name as "Isaiah." *Id.* at 5.

### E. The Georgia GPS Warrant.

Convinced they had their robber, agents then sought Mr. Dotson's present-day location. They applied for a warrant to obtain GPS data from the suspect cell phone number. *Id.* at 7. That data, in turn, would likely lead them to Mr. Dotson himself. A Georgia magistrate judge issued this warrant on April 18, 2022, compelling AT&T to provide Mr. Dotson's location data. Ex. D (Georgia GPS Warrant). Accordingly, the agents began tracking Mr. Dotson's movements.

The data suggested that Mr. Dotson traveled frequently across the United States—from Texas to Nevada to South Carolina to Georgia to California. Dkt. 1 at at 4. However, the data were insufficient to track Mr. Dotson with the precision necessary to arrest him. *Id.* at 3.

### F. The Stingray Warrant.

So investigators sought another warrant. This time, they requested not only GPS data, but also permission to use a mobile cell-site simulator—more

7

commonly known as a "Stingray." Ex. E (Stingray Warrant Application) at 2. The Stingray would be able "to obtain dialing, routing, addressing, or signaling information from the Subject Telephone, whether in use or not." *Id.* at 7. The Stingray does so by mimicking a cell site, tricking all nearby phones into attempting to connect to the Stingray rather than their actual mobile networks. *Id.*

This final tracking warrant likewise covered real-time cell tower records, as well as the phone GPS data previously covered by the Georgia warrant—which was set to expire on May 29, 2022. *Id.* at 3.

To obtain the warrant, the affiant agent summarized the case against Mr. Dotson. Ex. F (Stingray Warrant Affidavit) at 3–8. In particular, the agent claimed that the evidence tended to inculpate Mr. Dotson in assault, using a firearm during a crime of violence, robbery of government property, robbery of a postal employee, and conspiracy to interfere with commerce by robbery. *Id.* at 2.

The affiant claimed that prospective cell-phone location information "will constitute or yield evidence of" these past offenses. *Id.* When prompted to describe exactly how future location data might yield evidence of months-old robberies, the affiant was vague: "the information will often identify locations where evidence is stored and where search warrants may be appropriate." *Id.* at 7. The affiant did not articulate further.

The resulting warrant swept broadly. It was not limited in terms of where and when the Stingray could be deployed. Ex. G (Stingray Warrant) at 5. And when deployed, the Stingray subjected all bystanders' phones to searches as well, forcing them to disconnect from actual cell towers and instead turn over their identifying information to law enforcement. Ex. F at 9–10 (noting that "the cell-site simulator will collect the unique identifiers not only of the Subject Telephone, but also identifiers belonging to nearby

8

non-target cellular telephones" and "may interrupt cellular service").

### G. The Arrest of Mr. Dotson.

With this new tracking warrant in hand, investigators finally found Mr. Dotson. The GPS data "placed DOTSON's phone near the Del Mar Fairgrounds" in San Diego. Ex. H (Report of Investigation) at 4. Members of the DEA Narcotic Task Force, the Technical Operations Group, and the San Diego Police Department "established surveillance" accordingly. *Id.* The Technical Operations Group, in particular, "initiated [the] cell simulator" to zero in on Mr. Dotson. *Id.*

Three hours later, the Stingray detected Mr. Dotson's phone. It placed him near the I-5/I-805 interchange. *Id.* From there, officers tracked Mr. Dotson to the Subway restaurant in Kearny Mesa. *Id.* There, they observed Mr. Dotson and a female passenger inside a silver Toyota Avalon. *Id.* Agents followed the couple as they left the parking lot and executed a vehicle stop when they reached Del Mar. *Id.*

Body-worn camera captured what happened next. Mr. Dotson yielded immediately, pulling over on Via de la Valle. Ex. I (Footage Titled 211_Suspect_Hot_Stop) at 2:47. Despite his compliance, the officers immediately drew their guns and threatened him with a police dog. *Id.* at 3:30–4:10. The dog pulled at his leash, barking and lunging for Mr. Dotson (and for his handler as well, apparently). *Id.* at 4:19–5:55. The officers were clear: "If you run you're going to get bit by a police dog. You understand?" *Id.* at 3:30.

Mr. Dotson heard them loud and clear. He put his hands out the door, turned off his car, and followed their orders carefully. Officer Michael Day took charge of the scene, dictating Mr. Dotson's movements at every step. *Id.* at 5:03–5:35.  So, keeping his hands in the air, Mr. Dotson slowly walked backwards. *Id.* at 5:35–6:00. When he reached the huddle of officers, they

handcuffed him and placed him into a squad car without resistance. Ex. J (Footage Titled Tstop-2) at 2:50–3:30. The officers proceeded to do the same to Mr. Dotson's indisputably innocent passenger, Leticia Duvall. *Id.* at 3:30–4:45.

Officer Day then led six officers to "clear" the car. Ex. I at 7:45–8:25. In doing so, the officers opened the car's trunk and doors and looked inside. *Id.* at 8:25–8:59. They did so immediately after arresting both occupants, without speaking to either detainee. *See id.*; *see also* Ex. K (Declaration of Isaiah Dotson).

Based on the number of body-worn camera files produced by the government in discovery, there were at least thirteen law enforcement officers involved in the arrest of Mr. Dotson. At least five of those officers drew their guns on Mr. Dotson and Ms. Duvall—including handguns, shotguns, and an assault rifle.

The officers conducted a thorough search of the car in short order. Ultimately, they discovered the ammunition with which Mr. Dotson is presently charged, assorted mail, and four cell phones. *See* Ex. L (Footage Titled Axon_Body_3_Video_2022-06-02_1416_X6030746Q) at 1:02–5:00. They did not recover a firearm or any controlled substances.

**H. The Cell Phone Warrant.**

A local DEA Agent, James Gillis, later applied for warrants to search the cell phones.[2] In his warrant application, Agent Gillis recited the facts tending to suggest that Mr. Dotson was responsible for robbery-related

---

[2] Only two warrants—for Target Devices 1 and 3—were actually signed by Judge Dembin. Mr. Dotson assumes that the government did not execute the unsigned warrants, but prophylactically moves to suppress the results of any search of those Target Devices. *United States v. Evans*, 469 F. Supp. 2d 893, 900 (D. Mont. 2007).

offenses in Georgia. Ex. M[3] (Phone Warrant Application) at 9–12. Based on these facts, he claimed probable cause to accuse Mr. Dotson of mail theft, assault, robbery of government property, robbery of a postal employee, conspiracy to interfere with commerce by robbery, brandishing a firearm during a crime of violence, general conspiracy, and being a felon in possession of ammunition. *Id.* at 13.

But when prompted to explain why Mr. Dotson's phones contained evidence of these offenses, Agent Gillis veered off track. Rather than opine on the cell-phone habits of robbers, Agent Gillis instead focused on drug dealers. He claimed expertise in "narcotics and gang investigations" and participation in multiple related assignments. *Id.* at 7. He explained that "it is a common practice for individuals involved in the distribution of controlled substances" to use cell phones as part of their work. *Id.* at 7–8. Accordingly, "conspiracies involving the manufacture and distribution of controlled substances generate many types of evidence" to be found on the dealers' phones. *Id.* at 8.

Nowhere in this application did Agent Gillis explain how robbers use phones in furtherance of their crimes. As a result, there was no articulated nexus between Mr. Dotson's phones and the offenses for which the agent claimed probable cause.

The warrant issued anyway. Ex. N (Phone Warrant). Like the Stingray warrant, the phone warrant swept broadly. It authorized the seizure of data starting January 1, 2021 and ending June 2, 2022—predating the first robbery by ten months and postdating the second robbery by four months. *Id.* at 4.

---

[3] Agent Gillis submitted an identical warrant application for each of the four phones seized. To reduce the burden on the Court, Mr. Dotson has only included one of the four as an exhibit.

11

The type of data subjected to seizure, too, was essentially limitless. Attachment B, for instance, authorized "the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below." *Id.* at 4. The file types subject to seizure were "electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data[.]" *Id.*

## I. Procedural History.

After a few days facing state charges, Mr. Dotson was brought to federal court. He previously moved to dismiss the indictment on the grounds that section 922(g) violates the Second Amendment, which this Court denied. He now brings this motion to suppress.

Throughout this case, Mr. Dotson has pursued further discovery related to the investigation precipitating his arrest. *See* Dkt. 18 (Motion to Compel Discovery). This possible discovery is directly relevant to the instant motion, and Mr. Dotson has considerably delayed filing this motion in the hopes of obtaining it.

Unfortunately, the assigned Assistant United States Attorney has reportedly "exhausted all opportunities to find" this evidence. As a result, Mr. Dotson has no information on several key factual issues, such as what type of facial recognition software was used, what surveillance images were inputted into it, what circumstances attended the eyewitness lineup, and what model of cell-site simulator was employed, among other potential pieces of evidence.

As a result, Mr. Dotson has done his best to make what claims he can based on the discovery provided thus far. He reserves the right to modify or add to his arguments based on further potential discovery.

12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   ARGUMENT

The search and seizure of Mr. Dotson violated the Fourth Amendment at every stage. **First**, the use of facial recognition software amounted to a warrantless search that did not result in a reliable identification of Mr. Dotson. **Second**, the "tower dumps" also constituted a warrantless search of Mr. Dotson—and countless innocent others—under *Carpenter v. United States*, 138 S. Ct. 2206 (2018). **Third**, the Stingray warrant issued without probable cause to believe that Mr. Dotson's latter-day location would serve as evidence of months-old robberies, and likewise operated as a dragnet search of all bystanders' phone data. **Fourth**, the arresting officers searched Mr. Dotson's car without obtaining his voluntary consent and without probable cause. And **fifth**, the phone warrants lacked the requisite nexus between Mr. Dotson's suspected wrongdoing and the contents of his phones and were otherwise too broad in scope. For all these reasons, this motion should be granted.

### A. The use of facial recognition software amounted to a warrantless search that produced an unreliable identification of Mr. Dotson.

The first step in the agents' investigation is the most unprecedented. Months of searching and consulting with experts have yielded no case in which courts have considered the Fourth Amendment ramifications of facial recognition technology. To undersigned counsel's knowledge, Mr. Dotson's case thus presents a question of first impression in American courts. Consequently, the analysis that follows is more thorough and theoretical than is usual for a suppression motion.

### i.   In the wake of Carpenter v. United States, courts have sought to maintain that degree of privacy against government that existed when the Fourth Amendment was adopted.

The Fourth Amendment guarantees the "right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. As evident from the text, the Amendment's touchstone is reasonableness. *Riley v. California*, 134 S. Ct. 2473, 2482 (2014). "Reasonableness generally requires" a warrant. *Vernoia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). Thus, warrantless searches are "per se unreasonable." *Katz v. United States*, 389 U.S. 347, 357 (1967).

A central tenet of Fourth Amendment jurisprudence is to prohibit "what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted." *Carpenter v. United States*, 138 S. Ct. 2206, 2209 (2018) (alteration in original) (quoting *Carroll v. United States*, 267 U.S. 132, 149 (1925)). Of course, many of the technologies that facilitate searches and seizures today do not resemble anything that the Framers could have imagined. So when courts assess how the Fourth Amendment applies to modern technology, they seek to "assure[] preservation of that degree of privacy against government that existed" at the founding. *Kyllo v. United States*, 533 U.S. 27, 34 (2001). The Court has paid particularly attention to these "Founding-era understandings . . . when applying the Fourth Amendment to innovations in surveillance tools." *Carpenter*, 138 S. Ct. at 2214.

Some call this "equilibrium-adjustment." Orin S. Kerr, *An Equilibrium-Adjustment Theory of the Fourth Amendment*, 125 Harv. L. Rev. 476, 480 (2011). In other words, "[w]hen new tools and new practices threaten to expand or contract police power in a significant way, courts adjust the level of Fourth Amendment protection to try to restore the prior equilibrium." *Id.* The goal is to "avoid dystopia." Orin S. Kerr, *Implementing Carpenter* 26 (2018)

When the Fourth Amendment was adopted, the government's agents lacked the authority, much less the ability, to rummage through homes and

businesses to retrace the steps of suspects. The Amendment constituted the Framers' "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era." *Riley*, 134 S. Ct. at 2494. Such exposing of "the privacies of life," *Boyd*, 116 U.S. at 630, constituted an "abuse that more than any one single factor gave rise to American independence." *Harris v. United States*, 331 U.S. 145, 159 (1947) (Frankfurter, J., dissenting); *see also Riley*, 573 U.S. at 403.

Ultimately, the Framers settled on an equilibrium: Searches generally require warrants and that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. That legal regime was deemed sufficient given that law enforcement already faced "ordinary checks" in "limited police resources and community hostility." *United States v. Jones*, 565 U.S. 400, 416, (2012) (Sotomayor, J., concurring). "Traditional surveillance for any extended period of time was difficult and costly and therefore rarely undertaken." *Id.* at 429 (Alito, J., concurring). That equilibrium mostly held for more than 200 years. Then came the "digital age." *Carpenter*, 138 S. Ct. at 2217.

The Supreme Court has provided a few guideposts as to when a new technology disrupts that equilibrium and triggers the Fourth Amendment's protections: "First, that the Amendment seeks to secure 'the privacies of life' against 'arbitrary power.' Second, and relatedly, that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Id.* at 2214 (firstly and secondly quoting *Boyd*, 116 U.S. at 630 and then quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). In *Carpenter*, the Court put some meat on those bones when it held that the government generally needs a warrant to access historical cell-site location information, or "CSLI," from a mobile phone company that corresponds to a

specific person's cell phone. *Id.* at 2223.

### ii. Surveillance technology exposes the privacies of life to arbitrary power when it allows the government to amass location information.

Surveillance technology exposes "'the privacies of life' [to] 'arbitrary power'" when it permits the government to amass time-stamped geolocation information. *Id.* at 2214. Such "data provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 2217 (quoting *Jones*, 565 U.S. at 415) (Sotomayor, J., concurring)). That remains so "[i]n cases involving even short-term monitoring." *Id.* Such "deeply revealing" details make up the core of life in a thriving society premised on ordered liberty. *Carpenter*, 138 S. Ct. at 2223. Yet, "[a]wareness that the government may be watching chills associational and expressive freedoms." *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring).

The government attains arbitrary power over such privacies when it gains "unfettered discretion" over who it "chooses to track," regardless of who, where, or when. *Id.* That is what happens with CSLI. Cell phone companies can keep location data up to five years. *Carpenter*, 138 S. Ct. at 2218. The government "can store such records and efficiently mine them for" longer. *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring). There are no practical barriers other than cost of hard-drive space, making "cell phone tracking . . . remarkably easy, cheap, and efficient compared to traditional investigative tools." *Carpenter*, 138 S. Ct. at 2217–18.  And "because location information is continually logged for all of the 400 million [cell phones] in the United States—not just those belonging to persons who might happen to come under investigation—this newfound tracking capacity runs against everyone." *Id.* at 2218. Thus, "police need not even know in advance whether they want to

16

1  follow a particular individual." *Id.* They only need consult a phone company
2  or records they have amassed from previous requests.

### iii.   Technology creates "too permeating police surveillance" when it exceeds society's expectations of the government's capabilities and mines data not voluntarily exposed.

*Carpenter* teaches that surveillance technology promotes "a too permeating police surveillance," *id.* at 2214, and thus constitutes a search, when it (1) exceeds "society's expectations" of the government's investigative capabilities, *id.* at 2217, and (2) mines personal data that people do not "voluntarily" expose, *id.* at 2220.

One prominent scholar summed up *Carpenter*'s rule as thus: "If the police can easily take investigative steps that far exceed their powers in the past, the thinking runs, the newfound ability violates a reasonable expectation of privacy." Kerr, *Implementing Carpenter*, *supra*, at 7. Now, courts must ask "whether technological change has rendered obsolete a past expectation of a practical limit on governmental power." *Id.* at 8. In *Carpenter*, the Court held that historical CSLI cleared this bar because, in the pre-digital age, "society's expectation ha[d] been that law enforcement agents and others would not—and indeed, in the main, simply could not— secretly monitor and catalogue every single movement of an individual's car for a very long period." *Carpenter*, 138 S. Ct. at 2217.

Officers at the Founding "might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken.'" *Id.* (quoting *Jones*, 565 U.S. at 429 (Alito, J., concurring)). As Justice Alito put it colorfully, to accomplish similar surveillance on a horse-drawn coach in 1791 "would have required either a gigantic coach, a very tiny constable, or both—not to mention a constable with incredible fortitude and patience." *Jones*, 565 U.S. at 421 n.3. CSLI thus

17

"gives police access to a category of information otherwise unknowable." *Carpenter*, 138 S. Ct. at 2218

The final requirement of a *Carpenter* search is that the data collected by the government was not "voluntarily" exposed by the person surveilled. *Carpenter*, 138 S. Ct. at 2220. One way to meet that requirement is "when the government collects third-party records that are inescapably created through use of broadly used services." Kerr, *Implementing Carpenter*, *supra*, at 20. To whatever extent one has a reduced expectation in the privacy of information passed on to another, that logic fails when the data is produced by an activity that is "indispensable to participation in modern society." *Carpenter*, 138 S. Ct. at 2220.

That is why the Court held that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life'" that the data they emit automatically is "not truly 'shared' as one normally understands the term." *Id.* Cell phones generate location data during phone calls, while texting, e-mailing, or accessing the plethora of apps that populate home screens. *Id.* "Apart from disconnecting the phone from the network, there is no way to avoid leaving behind a trail of location data." *Id.* In other words, because "[s]ome amount of sharing is inevitable in a networked world[,] *Carpenter* treats the inevitable sharing as a baseline and protects it." Kerr, *Implementing Carpenter*, *supra*, at 21.

Under that framework, *Carpenter* held that the government's accessing of at least seven days' worth of historical cell-site location data for a single person is a search under the Fourth Amendment. 138 S. Ct. at 2217 n.3. The Court declined to "decide whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be." *Id.* Even so, it is worth noting that one of the record requests that the Court deemed a

Fourth Amendment search produced just two days' worth of data. *Id.*

### iv. The government impermissibly used facial-recognition technology to identify Mr. Dotson and retrace his past movements through geolocation data.

The government violated the Fourth Amendment when it placed him at a gas station in Georgia through facial recognition rather than old-fashioned police work. It violated his reasonable expectation of privacy through technology that exposed the privacies of life to arbitrary power and a too permeating police surveillance.

Without facial recognition technology, the government has no case. It had no basis to put Mr. Dotson in questionable photo lineups that produced an equivocal identification. It had no basis to pick out his mother's phone number among hundreds from warrantless tower dumps. It had no basis to obtain his personal cell phone records, or drive through San Diego hoping to snatch his cell phone's signal out of the ether. Instead, all that constitutes fruit of an incurably poisonous tree.

There is another problem. Whether or not facial recognition technology is itself a search, the government has failed to demonstrate the reliability of the facial recognition software used in this case. That is a problem because (1) facial recognition software is infamously unreliable when it comes to identifying Black men like Mr. Dotson, and (2) the facial recognition identification was nonetheless used to place Mr. Dotson in a photo lineup and cited as a basis for obtaining a warrant that led to his arrest.

To see the problems, it first helps to understand how facial recognition software generally works.[4] First, a camera or computer obtains an image or series of images of a person. Jennifer Lynch, Elec. Frontier Found., *Face Off:*

---

[4] Because the government has not provided any details on the facial recognition software used here, Mr. Dotson must rely on generalities that apply to commonly used software.

*Law Enforcement Use of Face Recognition Technology* 4–5 (2018).  Second, a computer strips away all color and any of the image outside the face. *Id.* at 5. It marks the eyes. *Id.* Third, the computer uses an algorithm to pick out a series of measurements that can be standardized across faces—the distance between eyes, the shape of the chin, the nose, and the edges of the mouth. *Id.* These measurements form the basis of a "face template," a graphical representation of the distance between these various points. *Id.* It resembles an astrology book that has drawn lines between stars of a constellation. *See id.* This template is then stored in a database along millions of other templates. Face recognition companies "train" their systems by feeding the system different images of the same person. Clare Garvie et al., Ctr. on Privacy and Tech., Georgetown Law, *The Perpetual Lineup* 9 (2016). Through this feeding, the computer learns which measurements most reliably indicate a match. *Id.*

Once a system is trained, the government can perform this analysis on unidentified individuals. *Id.* Algorithms will look for matches between the measurements on the face template from the unknown individual with the templates in its database, culled from mug shots, drivers' licenses, and other pictures. Depending on the confidence interval set by the government or the face surveillance company, the government will receive a series of possible matches. *Id.* That "candidate list" generally includes a ranked score, generated by the algorithm, "ranked in order of likelihood of correct identification[.]" Lynch, *supra*, at 6.

**v.    The use of facial recognition technology to retrace a person's physical movements is a search under *Carpenter*.**

The government violated Mr. Dotson's reasonable expectation of privacy when it used facial recognition software to determine his past location. By its very nature, facial recognition technology exposes the

privacies of life to arbitrary power. And, as this case demonstrates, such surveillance, surpasses society's expectations of law enforcement's capabilities by obtaining previously unknowable location information that Mr. Dotson did not voluntarily reveal.

### a. Facial recognition exposes the privacies of life to arbitrary power.

First, like the CSLI at issue in *Carpenter*, facial recognition technology exposes the privacies of life to arbitrary power. It allows the government to involuntarily identify anyone wherever there is a security camera. As of 2018, there were 70 million surveillance cameras installed in the United States. Stanislava Ilic-Godfrey, *Artificial Intelligence: Taking on a Bigger Role in Our Future Security*, U.S. Bureau of Labor Statistics (May 2021), https://www.bls.gov/opub/btn/volume-10/investigation-and-security-services.htm#_edn13. That is one camera for every 4.7 people. And even a single use of facial recognition could expose one's "familial, political, professional, religious, and sexual associations.'" *Carpenter*, 138 S. Ct. at 2217. That is not the stuff of science fiction. China places facial recognition cameras outside of mosques to track members of Uighur minorities. *E.g.*, Paul Mozur, *Facial Scans Tighten China's Grip on a Minority*, N.Y. Times (April 14, 2019), at A1.

Such "[a]wareness that the government may be watching chills associational and expressive freedoms." *Jones*, 565 U.S. at 416 (Sotomayor, J., concurring). That leaves people within an impossible choice: avoid constant government surveillance or participate in modern society. In *Carpenter*, the Court was clear that the Constitution proscribes such an Orwellian bargain. 138 S. Ct. at 2220. People must be able to shop at a market, visit a doctor, attend worship, join a protest, and enter a voting booth without assuming the risk of being digitally identified by an unseen camera.

21

And because the cameras, like the cell towers, are everywhere and the pictures, like CSLI, can be stored forever, the government's power over whom to identify is arbitrary. Indeed, in this case the facial recognition software could flag anyone in a database maintained by Georgia's Department of Driver Services. *See* Complaint at 2. That dataset is vast, but also arbitrarily constrained. Those not in the dataset—no matter how much they might resemble the person in the security camera footage—are exempt from search.

### b. Facial recognition technology promotes a too permeating police surveillance.

Second, even more so than CSLI, facial recognition technology promotes a "too permeating police surveillance" premised on involuntarily exposed information. If a lodestar of the Fourth Amendment law is to maintain the equilibrium between society and law enforcement present at the founding, *Kyllo*, 533 U.S. at 34, facial recognition goes far astray. Prior to the digital age, the government could not learn the name of any person who walked by any point of interest anywhere in the country. Such knowledge would require a vast network of snoops with an uncanny ability to know everyone in their town.[5] Yet that is what facial recognition permits. As with device-based location tracking, facial recognition technology removes the restrictions of manpower and cost that previously governed continuous surveillance of an individual. People, understandably, expect the government "would not—and indeed, in the main, simply could not" accomplish such total awareness for anyone, regardless of the severity of their crime. *Carpenter*, 138 S. Ct. at 2217.

Facial recognition also promotes a too permeating surveillance because

---

[5] And, as Justice Gorsuch has noted, even such a network may raise its own Fourth Amendment concerns. *See* Transcript of Oral Argument at 83, *Carpenter* 138 S. Ct. 2206 (No. 16-402) ("John Adams said one of the reasons for the war was the—the use by the government of third parties to obtain information—force them to help as their snitches and snoops.")

it relies upon data that people do not voluntarily expose—at least no more than CSLI. If "carrying [a phone] is indispensable to participation in modern society," *Carpenter*, 138 S. Ct. at 2220, certainly the same could be said of going outside inevitably exposing one's face. "A person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Carpenter*, 138 S. Ct. at 2217. Thus, Mr. Dotson's face was "not truly 'shared' as one normally understands the term." *Id.* at 2220.

*Carpenter* teaches that it is no answer that, in the context of analog surveillance, traditional photography does not trigger the Fourth Amendment, *Dow Chem. Co. v. United States*, 476 U.S. 227, 229 (1986), or that one has no reasonable expectation of privacy in one's physical characteristics, *United States v. Dionisio*, 410 U.S. 1, 14 (1973). In *Carpenter*, the Court acknowledged that one traditionally had no reasonable expectation of privacy in one's location and physical movements. 138 S. Ct. at 2215 (citing *United States v. Knotts*, 460 U.S. 276, 281 (1983)). But *Knotts* did not govern the collection of cell-site location information because, unlike with physical surveillance, CSLI permits perfect, retrospective, and cheap surveillance based on a "deep repository" of data that no analog investigation could recreate. 138 S. Ct. at 2218.

So too here. Facial recognition, based on databases of facial features that no human could memorize, permits cheap, omnipresent, and retrospective surveillance. With the click of a button, the government could ask an omniscient witness who—in the entire state of Georgia—most resembled the suspect. No gas station clerk or roadside motorist—no matter how sharp their memories—could answer that question. To equate facial recognition technology with ordinary physical observation "is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies

23

lumping them together." *Riley*, 573 U.S. at 393.

Thus, much like the CSLI in *Carpenter*, the use of facial recognition technology against Mr. Dotson violated his reasonable expectation of privacy and required a warrant.

### vi. Regardless, facial-recognition technology cannot provide the basis for obtaining Mr. Dotson's cell-site location information because the government has not verified its reliability.

Alternatively, the facial recognition technology used here—even if not a search—is so lacking in indicia of reliability that it voids the search warrant used to track and ultimately find Mr. Dotson and his cell phone. Despite repeated requests by Mr. Dotson, the government has not provided any information about the facial recognition technology used in this case beyond that stated in the complaint. That failure mandates suppression.

Indeed, the intermediate appellate court in New Jersey just held that a criminal defendant has a right to examine the source code, error rates, and other information about facial recognition software used in his prosecution. *State v. Arteaga*, No. A-3078-21, 2023 WL 3859579, at *9 (N.J. Super. Ct. App. Div. June 7, 2023). In doing so, it recognized "convincing evidence of [facial recognition]'s novelty, the human agency involved in generating images, and the fact [facial recognition]'s veracity has not been tested or found reliable on an evidential basis by any New Jersey court." *Id*. This reasoning echoes the familiar threshold requirement of reliability for searches executed based on drug dog alerts. *See, e.g.*, *United States v. Lingenfelter,* 997 F.2d 632, 639 (9th Cir. 1993). Without such a showing here, the government cannot meet its burden to justify the agents' reliance on the software.

The potential problems with facial recognition technology are legion. First, not all algorithms are created equal. The National Institute of

24

Standards and Technology ("NIST")—the federal agency tasked with ensuring accuracy and standardized measurements in technology and science—conducted tests on image verification algorithms, finding that many facial recognition software providers on the market may have error rates several orders of magnitude higher than the leading providers Nat'l Inst. Of Standards & Technology, *Ongoing Face Recognition Vendor Test (FRVT) Part 2: Identification* 9 (2018).

Second, the accuracy of face recognition is directly affected by the quality of the photos being searched—error rates will be greater when two photographs contain different lighting, shadows, backgrounds, poses, or expressions. P. Jonathon Phillips, et al., Nat'l Inst. Of Standards & Technology, *An Introduction to the Good, the Bad, & the Ugly Face Recognition: Challenge Problem* 346 (2011). Pictures taken from surveillance videos, such as in this case, are often of low-resolution and lead to less accurate results. Shahina Anwarul & Susheela Dahiya*, A Comprehensive Review on Face Recognition Methods and Factors Affecting Facial Recognition Accuracy*, *in* Proceedings of the Int'l. Conf. on Recent Innovations in Computing 2019, 495, 497–98 (2019).

Third, although it is unknown what occurred here, images are often edited. Some edits are designed to "'normalize' the face, artificially rotating it into a frontal, well-illuminated view." Davide Castelvecchi, *Is Facial Recognition Too Biased to be Let Loose?* Nature (Nov. 18, 2020). Others are less benign and subject to more human judgment, and "often amount to fabricating completely new identity points not present in the original photo." Clare Garvie, *Garbage In, Garbage Out: Face Recognition of Flawed Data*, Georgetown Ctr. On Privacy & Tech. (May 16, 2019), https://www.flawedfacedata.com/. Notable examples include pasting other people's features over the probe's face, copying and mirroring a partial face,

and blurring the photo. *Id.* Such practices lead to less accurate matches. *Id.*

Fourth, the algorithms can be warped by a poor sample of photographs. "Over time, an algorithm learns to pay more attention to the features that were the most reliable signals that the two images contained the same person." Garvie, *The Perpetual Lineup*, *supra*, at 9. Because the algorithms learn through these training photos, the set of training photos used greatly impacts the accuracy of the system; a system can accurately identify only photos that are like those it has trained on. Sidney Perkowitz, *The Bias in the Machine: Facial Recognition Technology and Racial Disparities*, Mass. Inst. Tech. (Feb. 5, 2021), https://mit-serc.pubpub.org/pub/bias-in-machine/release/1. A prominent example of such bias is that most facial recognition systems preform worse with non-white faces, such as Mr. Dotson's. *Id.*

Accuracy issues arise not only based on the training photos and the algorithm used, but also based on the database a probe photo is searched against. Facial recognition systems are bad at accurately finding matches when searching against a large database of images, in part because so many people within a given population look like one another. Adrienne LaFrance, *The Ultimate Facial-Recognition Algorithm*, The Atlantic (June 28, 2016). Moreover, the system can only search through people already in the database, and it will return its best match, which may be a low-quality match, even if the target is absent. *See* Rebecca Darin Goldberg, *You Can See My Face, Why Can't I: Facial Recognition and Brady*, 5 Columbia Human Rights Law Rev. Online 263, 267 (2021). That seems particularly relevant here, where the photo database used was limited to people on file with the Georgia Department of Driver Services. *See* Complaint at 2

Finally, the government has provided no explanation of how it selected Mr. Dotson's photograph from the list of unknown candidates provided by the

unknown algorithm. "Operator training and match presentation is so important to managing the risks of facial recognition systems. Operators must be aware of how their systems actually operate if they are to make informed judgments about how to adjudicate potential matches." William Crumpler & James A. Lewis, *How Does Facial Recognition Work?* Center for Strategic and International Studies (June 10, 2021), https://www.csis.org/analysis/how-does-facial-recognition-work. However, there is no specific degree or standardized training for this role. Because the degree of expertise in conducting facial comparisons is highly variable, the accuracy of this process is highly variable as well.

In sum, facial recognition systems vary in their reliability, many produce unacceptably high levels of false positives, and all of them perform significantly worse under real-world conditions. For example, "the error rate for one leading algorithm climbed from 0.1% when matching against high-quality mugshots to 9.3% when matching instead to pictures of individuals captured 'in the wild,' where the subject may not be looking directly at the camera or may be obscured by objects or shadows." William Crumpler, *How Accurate are Facial Recognition Systems – and Why Does It Matter?*, Center for Strategic and International Studies (April 14, 2020), https://www.csis.org/blogs/strategic-technologies-blog/how-accurate-are-facial-recognition-systems-and-why-does-it.

That has real-world implications for law enforcement. The system used by the Detroit police, if used on its own, would misidentify someone "96% of the time," according to Detroit's own police chief. Elaisha Stokes, *Wrongful Arrest Exposes Racial Bias in Facial Recognition Technology*, CBS News, Nov. 19, 2020, https://www.cbsnews.com/news/detroit-facial-recognition-surveillance-camera-racial-bias-crime/. Wrongful arrests are an ongoing reality. *E.g.*, Kashmir Hill & Ryan Mac, *Hidden Technology Put the Wrong*

*Person in Jail*, N.Y. Times (March 31, 2023), at B1. Indeed, the Department of Justice has said that "[f]ace recognition search results are not considered positive identification and do not establish probable cause, without further investigation; rather, they are advisory in nature as an investigative lead only." Bureau of Justice Assistance, Dep't of Justice, *Face Recognition Policy Development Template* 4 (2017).

Yet here, the government's use of facial recognition technology was the linchpin of its warrant application to track Mr. Dotson's phone. Although the government also pointed to an equivocal photo identification by a witness—that identification was premised on an unreliable lineup of photographs produced, at least in part, by unverified facial recognition software. Garbage in, garbage out.

Thus, even if the Court concludes that the government's use of facial recognition software did not violate Mr. Dotson's reasonable expectation of privacy, the software used in this case is insufficiently reliable and the fruits of the warrant to track Mr. Dotson's cell phone must be suppressed.

**B. The government violated the Fourth Amendment when it obtained the cell-site location information of Mr. Dotson, and every other person who interacted with certain cell phone towers, without a warrant backed by probable cause.**

The next step in the investigation was just as flawed. Specifically, the government violated the Fourth Amendment in three ways when, without a warrant, it obtained Mr. Dotson's CSLI across multiple days and multiple locations through so-called "tower dumps." Exs. B and C. First, under *Carpenter*, the government violated Mr. Dotson's reasonable expectation of privacy. Second, the government violated Mr. Dotson's property interest in his CSLI. Finally, tower dumps, at least as conducted in this case, resemble general searches that cannot be sanctioned by the Fourth Amendment. Indeed, the orders here are so facially overbroad—and out of step with a

28

decade of tower-dump litigation—that they bar the government from making any claim of good-faith reliance.

Another primer on the technology at play will help show why that is so. "Cell phones perform their wide and growing variety of functions by connecting to a set of radio antennas called 'cell sites.'" *Carpenter*, 138 S. Ct. at 2211 (majority opinion). Cell sites usually cover a circular area, with several antennas pointing in different directions that divide the site's coverage area into smaller wedge-shaped sectors. *Commonwealth v. Perry*, 184 N.E.3d 745, 752 (Mass. 2022)

Cell phones, on their own accord, continuously seek the best signal—usually from the nearest cell cite. *Carpenter*, 138 S. Ct. at 2211. And in the age of smart phones, the devices access the network, again on their own accord, "several times a minute whenever their signal is on, even if the owner is not using one of the phone's features." *Id.*

Each time it does so, the phone company creates time-stamped data called cell-site location information, or "CSLI." *Id.* CSLI contains the phone number for the phone that accessed the network; the unique identification number of the specific device; the source and destination associated with each call, text, or data transmission; and the type of communication transmitted to each tower. *See* Ex. B. CSLI also contains the precise location of the cell site and the "sector" of that cite that provided service to each communication with a phone. *Id.*; *Perry*, 184 N.E.3d at 753.

Thus, the accuracy of the approximated location varies. *Id.* It depends on the size of the coverage area, which in turn depends on the number of nearby cell sites, as well as the technology in use. Small cell technology—frequently used in large metropolitan areas, like Atlanta—"can identify an individual's location precisely, down to the specific floor of a particular building." *Perry*, 184 N.E.3d at 753.; *see also Small Cell Permits*, City of

Atlanta, https://atldot.atlantaga.gov/services-2/permits-2/small-cell.

Police generally obtain CSLI in two ways. First, they can compel a phone company to turn over all CSLI for a given cell phone over a given period. *Perry*, 184 N.E.3d at 753. That is what happened in *Carpenter,* and it now is generally unconstitutional without a warrant. Alternatively, police can compel a so-called "tower dump," where the phone company turns over all the CSLI logged by a given cell tower during a given time window. *Carpenter*, 138 S. Ct. at 2267 (Gorsuch, J., dissenting). That is what happened in the case.

### i. Exposing Mr. Dotson's physical location through multiple tower dumps violated his reasonable expectation of privacy under *Carpenter*.

The government violated Mr. Dotson's reasonable expectation of privacy—and conducted a warrantless search—when it accessed multiple days of his geolocation data through multiple tower dump orders. Indeed, as Justice Gorsuch recognized, *Carpenter*'s logic preordains that result.[6] "[A] tower dump" would seem to be "the paradigmatic example of 'too permeating police surveillance' and a dangerous tool of 'arbitrary' authority." *Id*. "On what possible basis could such mass data collection survive the Court's test . . . ?" *Id*. Thus, in a similar case, the Supreme Judicial Court of Massachusetts held that the use of multiple tower dumps in the investigation of multiple robberies and a murder constituted a search under the state's constitution, albeit through heavy reliance on *Carpenter*. *Perry*, 184 N.E.3d at 763. Much of the same analysis applies here.

---

[6] The Court in *Carpenter* did not "express a view on matters not before" it, including "tower dumps. 138 S. Ct. at 2220. Yet the Court described the technology at issue so broadly—"the ability to chronicle a person's past movements through the record of his cell phone signals," 138 S. Ct. at 2216— that it is hard to see how it does not apply to cases like this one.

### a. Tower dumps expose the privacies of life to arbitrary power.

First, as with the targeted CSLI in *Carpenter*, using tower dumps to amass location data over multiple days exposes the privacies of life to arbitrary power. In fact, that is even more so the case here because, unlike in *Carpenter*, the tower dumps allowed the government to amass data for "*everyone*" who happened to be near a crime scene "over some indefinite period of time."[7] *Id.* at 2267 (Gorsuch, J., dissenting).

Tower dumps, like targeted CSLI, can reveal not only a person's movements, but his "familial, political, professional, religious, and sexual associations.'" *Id.* at 2217. For example, the tower dumps here targeted multiple housing complexes in the Atlanta area. Application for Tower Records at 4–6, No. 1:22-mj-0126 (N.D. Ga. Feb. 9, 2022). That could give the government insight into familial and sexual associations. And the three locations targeted by the two orders were very near houses of worship.[8]

All of that was exposed to the arbitrary whims of the government's investigators. The tower dump orders here contained no limitation on how the government stored or used the data. The government need only decide where, when, and then whom it would like to investigate. Once it does, its agents can effectively "travel back in time to retrace" that person's steps, even before he or she was a criminal suspect. *Carpenter*, 138 S. Ct. at 2218.

---

[7] Although the tower dump orders here gave time windows across two days, they also directed phone companies to provide CSLI for any phone that initiated an ongoing connection with the targeted cell towers before that interval and for any phone that maintained a connection after the defined period. Ex. C at 3.

[8] Google Maps show that 1500 Sigman Road NW—the address targeted in the November 2021 tower dump—is down the street from "Voice of Faith Ministries." The apartment complex at 3475 Pleasant Hill Road—one of the addresses targeted in February 2022—advertises its proximity to the Korean Church of Atlanta. *Welcome to Your Neighborhood*, Rosemont Berkeley Lake, https://rosemontberkeleylake.com/neighborhood/. Meanwhile, 50 Adams Lake Boulevard is down the street from Atonement of Christ Ministries.

That is the province of Hollywood, not the Fourth Amendment.

To be sure, *Carpenter* addressed a request for CSLI spanning longer periods of time. But "the short-term nature of the average cell tower dump should not toll the death knell for Fourth Amendment protection." Emma Lux, *Privacy in the Dumps: Analyzing Cell Tower Dumps Under the Fourth Amendment*, 57 Am. Crim. L. Rev. Online 109, 113 (2020). That is because, as discussed above, the Court has held that the Fourth Amendment protects people not just from governmental collection of long-term location information, but also with protecting individuals from technological advancements encroaching on founding-era understandings of privacy rights." *Id.* at 113–14. And regardless, the government still obtained multiple days of CSLI, yet for untold numbers of people. To whatever extent the surveillance here lacked duration, it made up for it in spades with breadth.

> **b. Tower dumps foster "a too permeating police surveillance" by exceeding society's expectations of investigative capabilities and by utilizing data involuntarily exposed to the world.**

Second, using multiple tower dumps across multiple days fosters "a too permeating police surveillance" because it exceeds society's expectations about the government's capabilities using data that no person voluntarily exposes. Prior to the digital age, the government could not learn the precise location of the hundreds of people near any crime scene. Lux, *supra*, at 114 (2020). To continue Justice Alito's constable hypothetical from *Jones*, even if you had an unlimited supply of constables to interview every potential witness, 565 U.S. at 420 (Alito, J., concurring), one would still be stuck relying on the fallible memory of "nosy neighbor[s] who keep[] an eye on comings and goings," *Carpenter*, 138 S. Ct. at 2219. That means, "[t]here is no historic analogue for the ability effortlessly to compile and document the locations, identities, and associations of tens of thousands of individuals, just

in case one might be implicated in a criminal act." *Perry*, 184 N.E.3d at 762. Thus, when the Fourth Amendment was adopted, society reasonably expected that the government could not achieve perfect, effortless surveillance around every crime scene. And, as in *Carpenter*, the "retrospective" nature of tower dumps means that not just Mr. Dotson, but "everyone . . . has effectively been tailed every moment of every day for" as along as phone companies maintain CSLI. *Carpenter*, 138 S. Ct. at 2218; *see also Perry*, 184 N.E.3d at 762 (holding the same for multiple tower dumps).

Tower dumps also foster a too permeating surveillance because they rely upon data that people involuntarily leave behind through mere participation in modern society. As of 2021, 97% of Americans owned a cellphone. *Mobile Fact Sheet*, Pew Rsch. Ctr. (April 7, 2021), https://www.pewresearch.org/internet/fact-sheet/mobile/. Indeed, "carrying one is indispensable to participation in modern society." *Carpenter*, 138 S. Ct. at 2220 (citing *Riley*, 573 U.S. at 385). And, as in *Carpenter*, the CSLI data here was emitted by mere "dint of [a phone's] operation, without any affirmative act on the part of the user beyond powering up." *Id*. Thus, *Carpenter* dictates that Mr. Dotson's CSLI was "not truly 'shared' as one normally understands the term." *Id*.

In sum, the government violated Mr. Dotson's reasonable expectation of privacy when it obtained multiple days of CSLI. It thus was a search that required a warrant that the government failed to obtain.

### c. The government needed a warrant to access cell-site location information that belonged to Mr. Dotson.

The tower dumps here separately trigger constitutional protections because they trespassed upon Mr. Dotson's property rights. Although searches often are analyzed under the reasonable-expectation-of-privacy framework, that "test has been added to, not substituted for, the common-

law trespassory test" for searches and seizures. *Jones*, 565 U.S. at 409 (majority opinion). Under that test, the government conducts a search whenever it interferes with a person's possessory rights. *Id.* at 404–05; *accord Florida v. Jardines*, 569 U.S. 1, 5 (2013). Likewise, a seizure occurs when one's property rights are violated, even if the property is never searched. *Soldal v. Cook Cty.*, 506 U.S. 56, 62–64, 68 (1992). Digital records can be a person's "papers" no less than physical documents. *United States v. Wurie*, 728 F.3d 1, 14 (1st Cir. 2013), *aff'd sub nom. Riley*, 573 U.S. 373. And a person can retain constitutional protection of their papers or effects even when those items are in another's possession, as is often true of digital data. *See, e.g.*, *Ex parte Jackson*, 96 U.S. 727, 733 (1878) (sealed letters in possession of postal service). The question, then, is whether people hold enough of a property interest in their CSLI that it remains at least in part their "papers" under the Fourth Amendment.

They do. Possessory interest is defined as the "right to control property, including the right to exclude others." Black's Law Dictionary (11th ed. 2019) (emphasis added); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."). Property rights need not be exclusive to be effective, and a person can retain significant property rights in an item or location even if another entity holds equivalent or additional rights. *Jones*, 565 U.S. at 404 n.2 (recognizing that a bailee of property has sufficient property rights for Fourth Amendment purposes).

Determining whether the government has interfered with the security of one's papers or effects under the Fourth Amendment requires assessing a person's property rights in those items, including by reference to common-law trespass and property principles, *see id.* at 404–05, or positive law—

statutes, regulations, and similar enactments, *see Carpenter*, 138 S. Ct. at 2270 (Gorsuch, J., dissenting); *State v. Wright*, 961 N.W.2d 396, 415–17 (Iowa 2021) (relying on municipal ordinance to hold that police seizing and examining garbage is a trespassory search that requires a warrant under the state constitution); William Baude, James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1874 (2016). Under this framework, when the law protects against access by the public without consent unreasonable access by the government is prohibited as well. *E.g.*, *Carpenter*, 138 S. Ct. at 2270–71 (Gorsuch, J., dissenting).

Positive law establishes the relevant property interests in the CSLI at issue here. The Telecommunications Act requires "express prior authorization of the customer" before a service provider can "use or disclos[e] . . . call location information," 47 U.S.C. § 222(f), and provides "customers a private cause of action for damages against carriers who violate the Act's terms," *Carpenter*, 138 S. Ct. at 2272 (Gorsuch, J., dissenting) (citing 47 U.S.C. § 207). The Act also designates location information as "customer proprietary network information," or "CPNI." 47 U.S.C. § 222(c)(1)–(2), (h)(1)(A). That is a category of records that the service provider cannot disclose without "approval of the customer." 47 U.S.C. § 222(c)(1)–(2), (h)(1)(A). As the Federal Communications Commission explains, location information "clearly qualifies as CPNI," and therefore subjects service providers to "a duty to protect [its] confidentiality." *In re Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, 28 FCC Rcd. 9609, 9616 ¶ 22, 9619 ¶ 29 (2013).

And "to the extent CPNI is property, . . . it is better understood as belonging to the customer, not the carrier." *Second Report & Order and Further Notice of Proposed Rulemaking, In re Implementation of the*

*Telecommunications Act of 1996*, 13 FCC Rcd. 8061 ¶ 43 (1998), *vacated on other grounds by U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224 (10th Cir. 1999). When carriers have violated these provisions by denying customers the right to control others' access to their location information, they have been subject to aggressive enforcement actions by the FCC and to private suits. *See, e.g.*, Jennifer Valentino-DeVries, *Cellphone Carriers Face $200 Million Fine for Not Protecting Location Data*, N.Y. Times (Feb. 28, 2020), https://www.nytimes.com/2020/02/28/technology/fcc-cellphones-location-data-fines.html. In addition, the federal Communications Assistance for Law Enforcement Act, which otherwise requires phone companies to build lawful interception and surveillance capabilities into their networks, prohibits use of the federal pen register statute to "obtain any information that may disclose the physical location of the subscriber['s cell phone]." 47 U.S.C. § 1002(a)(2).

Given these protections, "customers have substantial legal interests in this information, including at least some right to include, exclude, and control its use." *Carpenter*, 138 S. Ct. at 2272 (Gorsuch, J., dissenting). In other words, individuals have a property right in their CSLI, making those records "their . . . papers[] and effects" under the Fourth Amendment. Where, as here, the government seeks access to those papers, it effects both a search and seizure requiring a warrant. And since the government lacked a warrant here, the search of Mr. Dotson's phone data was unreasonable.

### d. The tower dump orders in this case demonstrate that tower dumps almost always are incurably overbroad because they cannot be backed by sufficient probable cause and particularity.

The tower dump orders in this case demonstrate a third reason the CSLI must be suppressed: A request for CSLI through a tower dump is per se overbroad and lacks probable cause and particularity. Indeed, the tower

36

dump orders in this case were far broader than those approved—narrowly—in similar litigation, undermining any reliance the government placed on them.

As discussed above, searches generally require warrants. And "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Those words are not mere legalize. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927); *see also Berger v. New York*, 388 U.S. 41, 59 (1967). And, as also discussed above, the Fourth Amendment was written to end general searches.

Probable cause and particularity issues often arise when the government wants to search multiple people near the scene of a crime. That is because "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). "[A] search or seizure of a person must be supported by probable cause particularized with respect to *that* person." *Id.* (emphasis added). Because the Fourth Amendment protects people, "not places," it is no answer that "there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.*

The same law applies to tower dumps. Even if the cell site was near a crime scene, that does not give the government probable cause to search every person who accessed the cell site. Tower dump orders, like orders for similar digital dragnets, "struggle to achieve particularity because they do not describe a place for which there is probable cause to search all devices

37

present."[9] Haley Amster & Brett Diehl, *Against Geofences*, 74 Stan. L. Rev. 385, 432 (2022).

"Owning [a cell] phone is not a reason to believe that the individual 'had committed, was committing, or was about to commit any offense under state or federal law,' and it is not 'indicative of criminal conduct.'" *Id.* at 429 (citation omitted). Rather, the resulting inferences are pedestrian: "indicative of living in the twenty-first century and having the means to afford a smartphone." *Id.* at 429–30 (citation omitted); *see also* Lux, *supra*, at 116. "As with general warrants," allowing the government to sweep any communication information that merely *could* be related to a crime "leaves too much to the discretion of the officer executing the order." *Berger*, 388 U.S. at 59.

But such discretion is inherent to tower dumps. The very point is to obtain more people's data than necessary and then decide, in the officer's discretion, who is worth investigating. Because that so closely resembles the general warrants that inspired the Fourth Amendment, tower dumps are pre se unconstitutional.

That general rule governs here. The government cannot offer any evidence that it had probable cause for all people caught up in its three tower dumps over two days. Indeed, sanctioning the tower dumps here would be particularly perverse given that two of the orders hoarded data for entire apartment buildings. Yet commentators and courts agree that the government cannot use a single warrant to search an entire apartment

---

[9] The rare exception would be a tower dump covers a small area where virtually all cell phones may be implicated in a crime. As one prominent surveillance commentator noted, the United States Capitol on January 6, 2021, may be such a place. *See, e.g.*, Marcy Wheeler, *FBI Seems Confident in the Granularity of Their Capital Cell Tower Dumps*, emptywheel (May 9, 2021), https://www.emptywheel.net/2021/03/09/fbis-seems-confident-in-the-granularity-of-their-capitol-cell-tower-dumps/.

building unless it has probable cause to believe it will find evidence of a crime in each unit. *E.g.*, *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (holding that a warrant cannot authorize the government to search multiple subunits in a building if it does not establish probable cause for each unit).

Indeed, over the past decade, a growing chorus of judges have recognized that, at a minimum, tower dump orders and warrants[10] require marked restrictions on what data is collected and how it is stored to be constitutional. Thus, federal magistrate judges across the country have denied warrants for tower dumps because of the lack of such limitations. *E.g.*, *In re U.S. ex rel. Ord. Pursuant to 18 U.S.C. Section 2703(d)*, 930 F. Supp. 2d at 702; *In re United States for an Ord. Pursuant To 18 U.S.C. §2703(d)*, No. 2:17-MC-51662, 2017 WL 6368665, at *1 (E.D. Mich. Dec. 12, 2017). Others have granted tower dump warrants, but said that they did only because the applications for the data proposed restrictions on what data was used and how it was collected. *E.g.*, *Matter of Tower Dump Data for Sex Trafficking Investigation*, No. 23 M 87, 2023 WL 1779775, at *6 (N.D. Ill. Feb. 6, 2023); *In re Application of the U.S.A. for an Ord. Pursuant to 18 U.S.C. 2703(c), 2703(d) Directing AT & T, Sprint/Nextel, T-Mobile, Metro PCS, Verizon Wireless*, 42 F. Supp. 3d 511, 519 (S.D.N.Y. 2014); *Perry*, 184 N.E.3d at 769.

As Massachusetts' top court recognized, under the state constitution—which contains a particularity requirement for warrants identical to the Fourth Amendment's—a "warrant that would permit investigators to analyze, without limitation, any and all CSLI in the tower dumps" would constitute "general exploratory rummaging." *Perry*, 184 N.E.3d at 769. "Judicial authorization of such [a warrant] undoubtedly would violate the

---

[10] Some magistrate judges, even before *Carpenter*, concluded that tower dumps were so invasive that they required a warrant backed by probable cause. *E.g.*, *In re U.S. ex rel. Ord. Pursuant to 18 U.S.C. Section 2703(d)*, 930 F. Supp. 2d 698, 701 (S.D. Tex. 2012).

1    particularity requirement . . . ." *Id.*

2         But that is exactly what was authorized here. *See* Ex. B and C. The

3    government's reliance on such a facially invalid order—even after *Carpenter*

4    and a decade of tower-dump litigation—prohibits it from claiming any good-

5    faith reliance on the tower dump orders in this case.

6         In sum, tower dump orders generally are unconstitutional because of

7    their likeness to general warrants. That was the case here: The orders did

8    not even try to show that there was probable cause to believe that every

9    person—including Mr. Dotson—swept up in its dragnet was involved in a

10   crime. No such warrant could have issued even if the agents had sought one.

11   **C. The Stingray warrant was facially deficient because it failed**
12   **to connect Mr. Dotson's present-day location with evidence**
     **of months-old robberies and was incurably overbroad.**

13        And when they finally did obtain a warrant, it too was compromised.

14   Separate and apart from the facial recognition and tower dump issues, the

15   application for Mr. Dotson's prospective location data—gathered through

16   GPS and through the use of a cell-site simulator ("Stingray")—failed to

17   articulate *why* Mr. Dotson's future phone location would reveal evidence of

18   old robberies. Further compounding the problem, the warrant lacked any

19   meaningful limits on the use of the Stingray, subjecting unknown thousands

20   of people to baseless searches of their private cell phone information.

21   **i.   Stingrays function by searching all surrounding cell phones,**
22        **forcing them to disconnect from real cell towers and instead**
          **turn over their data to the Stingray.**

23        Cell site simulator technology does not work by passively

24   eavesdropping on signals that cell phones are already sending out. Instead,

25   the cell site simulator relies on deception in order to induce cell phones to

26   send out new signals. The government acknowledges as much. As explained

27   in its warrant application, "the cell-site simulator will collect the unique

28

identifiers not only of the Subject Telephone, but also identifiers belonging to nearby non-target cellular telephones" and "may interrupt cellular service" of callers in the area. Ex. D at 9–10.

Importantly, the cell site simulator does not simply induce cell phones to repeat messages that they would send out anyways; it also changes the content of the signals that are sent out. For privacy and security reasons, cell networks are designed so that cell phones do not constantly broadcast their uniquely identifying International Mobile Subscriber Identity (IMSI) numbers.[11] *See* Yomna N., Electronic Frontier Foundation, *Gotta Catch 'Em All: Understanding How IMSI-Catchers Exploit Cell Networks* (June 28, 2019), https://www.eff.org/wp/gotta-catch-em-all-understanding-how-imsi-catchers-exploit-cell-networks (providing extensive technical description of the technology at issue). Instead, networks are designed so that a cell phone only needs to send its IMSI number once, upon first connecting to an overall network (such as AT&T or Verizon). From that point on, the service provider "will assign you a TMSI (Temporary Mobile Subscriber Identifier) to use while on their network. The purpose of the pseudonymous TMSI is to try and make it difficult for anyone eavesdropping on the network to associate data sent over the network with your phone." *Id.* In other words, even as you move from tower to tower, your phone does not need to re-send its IMSI number so long as you stay connected to the same network.

Thus, cell site simulators are designed to make an otherwise rare event—the phone's initial connection to the network and transmission of the IMSI number—more common, so that the specific identifying information can be tracked and logged.

---

[11] The IMSI number uniquely identifies a user's SIM card.

1
2

### ii. Using a Stingray is a search because it forces phones to reveal private location and identity information without the owner's consent.

3

4

For the following reasons, use of a cell site simulator constitutes a search within the meaning of the Fourth Amendment. District courts across the country have held as much. *See, e.g.*, *In re Use of a Cell-Site Simulator to Locate a Cellular Device Associated with One Cellular Tel. Pursuant to Rule 41*, 531 F. Supp. 3d 1, 6 (D.D.C. 2021); *United States v. Lambis*, 197 F. Supp. 3d 606, 612 (S.D.N.Y. 2016); *and United States v. Espudo*, 954 F. Supp. 2d 1029, 1043 (S.D. Cal. 2013).

5

6

7

8

9

First, the devices transmit invisible, probing electronic signals that penetrate walls of Fourth Amendment-protected locations, including homes, offices, and other private spaces occupied by the target and innocent third parties in the area. Cell site simulators force cell phones within those spaces to transmit data to the government that they would not otherwise reveal to the government, and allow agents to determine facts about the phone and its location that would not otherwise be ascertainable without physical entry. By pinpointing suspects and third parties while they are inside constitutionally protected spaces, cell site simulators invade reasonable expectations of privacy. *See Kyllo*, 533 U.S. at 34 (thermal imaging to detect heat from home constituted search); *United States v. Karo*, 468 U.S. 705, 715 (1984) (monitoring of radiolocation beeper that was taken into residence constituted search).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Second, the devices can pinpoint an individual with extraordinary precision. Just as in this case, law enforcement agents nationally have used cell site simulators to pinpoint suspects' locations not only in free-standing houses, but even in specific apartments or areas within large apartment complexes. *See, e.g., State v. Tate*, 849 N.W.2d 798, 804 (Wis. 2014); *United*

24

25

26

27

28

*States v. Rigmaiden*, No. CR 08-814-PHX-DGC, 2013 WL 1932800, at *15 (D. Ariz. May 8, 2013); Tr. of Suppression Hr'g 14, 17, *State v. Thomas*, No. 2008-CF-3350A (Fla. 2d Cir. Ct. Aug. 23, 2010), available at http://bit.ly/1jYUgUT (last visited Oct. 22, 2019). In one Baltimore case, police reportedly used a cell site simulator to determine even that the person carrying the target phone was riding on a particular bus. Justin Fenton, *Judge Threatens Detective with Contempt for Declining to Reveal Cellphone Tracking Methods*, Balt. Sun, Nov. 17, 2014, available at http://bsun.md/1uE8k7v. Accurate electronic location tracking of this type requires a warrant. *Riley*, 134 S. Ct. at 2490 (noting Fourth Amendment implications of cell phone location data that can "reconstruct someone's specific movements down to the minute, not only about town but also within a particular building"); *Jones*, 565 U.S. at 430 (Alito, J., concurring in the judgement) ("[T]he use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.").

Third, cell site simulators search the metadata of people's phones by forcing those phones to transmit their electronic serial number and other identifying information held in electronic storage on the device, as well as the identity of the (legitimate) cell tower to which the phone was most recently connected and other stored data. *See* Stipulation, *United States v. Harrison*, No. 14 Cr. 170 (D. Md. Nov. 7, 2014), ECF No. 32-1 ("The simulator can also collect radio signals containing the channel and cell-site codes identifying the cell location and geographical sub-sector from which the telephone is transmitting."). As the Supreme Court held, searching the contents of a cell phone requires a warrant. *Riley*, 134 S. Ct. 2473.

Fourth, cell site simulators impact third parties on a significant scale. In particular, they interact with and capture information from innocent bystanders' phones by impersonating one or more wireless companies' cell

43

sites and thereby triggering an automatic response from all mobile devices on the same network in the vicinity. Dep't of Justice Policy Guidance: Use of Cell-Site Simulator Technology [hereinafter "DOJ Guidance"] 5 (Sept. 3, 2015), available at http://www.justice.gov/opa/file/767321/download. This is so even when the government is using a cell site simulator with the intent to locate or track a particular suspect; collection of innocent bystanders' phone identifying data and location information is inevitable and unavoidable using current cell site simulator technology. Ex. F at 9. Thus, when using a cell site simulator, the police infringe on the reasonable expectations of privacy of large numbers of innocent non-suspects, amplifying the Fourth Amendment concerns.

Fifth and finally, cell site simulators can, as a side-effect of their normal use, disrupt the ability of phones in the area to make calls. *See* DOJ Guidance at 5. Emergency calls to doctors, psychologists, and family members may be blocked while the cell site simulator is in use nearby. This is invasive in general, raises possible conflicts with federal law, *see* 47 U.S.C. § 333 (prohibiting interference with cellular transmissions), and can have enormous consequences for anyone in an emergency situation trying to make an urgent call for assistance. To avoid effecting an unreasonably invasive or destructive search, *see United States v. Ramirez*, 523 U.S. 65, 71 (1998), use of cell site simulators must thus be strictly constrained and explicitly authorized by a court.

### iii.    The warrant application here was facially deficient.

Here, the warrant and accompanying application did not meaningfully constrain the use of the Stingray. This is true for three reasons.

#### a. Without the prior illegal searches, there would be no probable cause to believe Mr. Dotson was the robber.

First, the warrant application impermissibly relied upon information

44

gleaned from the two prior illegal searches: the identification of Mr. Dotson flowing from the unreliable facial recognition software and the returns of the tower dump court orders. Shorn of this ill-gotten information, there would be no information pointing towards Mr. Dotson as a robbery suspect. *United States v. Wanless*, 882 F.2d 1459, 1466 (9th Cir. 1989). This conclusion holds true even if the magistrate could have considered the questionable identification of Mr. Dotson by the mailwoman from the October robbery. *Grant v. City of Long Beach*, 315 F.3d 1081, 1086 (9th Cir. 2002), *opinion amended on denial of reh'g*, 334 F.3d 795 (9th Cir. 2003).

> **b. Even assuming Mr. Dotson was the robber, his prospective California location could not be evidence of the retrospective Georgia robberies.**

Second, even including the facial recognition and tower dump results as fair game does not clear the government's probable cause hurdle. This is true because probable cause to arrest does not necessarily equate to probable cause to search. *United States v. Grandstaff*, 813 F.2d 1353, 1356 (9th Cir. 1987). To the extent that the magistrate had a substantial basis to conclude that Mr. Dotson was involved in these robberies, that does not, by itself, justify a search of his prospective location data. The affiant agent needed to offer a "substantial basis" to believe that Mr. Dotson's future location would shed light on the past robberies. *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985).

No such basis is present here. Rather than offer any particular theory of relevance, the agent simply asserted that prospective cell-phone location information "will constitute or yield evidence of" the Georgia offenses. Ex. F. at 2. When prompted to describe what this evidence might be, the affiant was vague: "the information will often identify locations where evidence is stored and where search warrants may be appropriate." *Id.* at 7.

These statements appeared divorced from any particular facts in Mr. Dotson's case—let alone any articulable evidential hypothesis for how the phone's identifying information and real-time location would tend to incriminate him in long-past robberies. Without more, the warrant application failed to identify the necessary "nexus . . . between the item to be seized and criminal behavior." *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 307 (1967).

Contrast this application with other Stingray applications in recent years. In *Matter of Use of A Cell-Site Simulator to Identify a Cellular Device in a Narcotics Trafficking Case,* "the agent's affidavit detail[ed] wiretap conversations that establish[ed]" the suspect as an active drug dealer using multiple unknown cell phones. 623 F. Supp. 3d 888, 894 (N.D. Ill. 2022). "Combined with the agent's training and experience that narcotics traffickers routinely use multiple cell numbers to conduct business, the affidavit provide[d] probable cause that the suspect likely uses multiple cell phones to conduct narcotics trafficking, and more specifically, [was] using a cell phone number which the government d[id] not have identifying information for and which is being used to perpetrate a crime." *Id.* The Stingray data, then, would tend to yield evidence of an ongoing offense committed through the phone itself. Other Stingray applications present similar commonsense connections between the phone data and evidence of crime. *See, e.g.*, *United States v. Tutis*, 216 F. Supp. 3d 467, 478 (D.N.J. 2016).

The reason for this omission seems intuitive enough: the agents were not actually seeking to build their case against Mr. Dotson using the Stingray data. Instead, they simply sought to locate him so that they could arrest him. The location data was a means to that end, not itself evidence of crime.

This search warrant was not the right avenue to effect Mr. Dotson's arrest. To be sure, if the agents had pursued the proper channels, they may

have been able to get his prospective location data to aid in serving an arrest warrant. One district court articulated the proper process as follows: The agents must demonstrate that "a valid arrest warrant has issued for the user of the subject cell phone; the subject cell phone is in the possession of the subject of the arrest warrant; and the subject of the arrest warrant is a fugitive, that is, has demonstrated intent to flee to avoid prosecution." *In re Application of U.S. for an Ord. Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 584 (D. Md. 2011).

But the agents here declined to engage in this process. Instead, the actual arrest warrant for Mr. Dotson issued *after* they apprehended him. *See* Arrest Warrant, 22-mj-2095-MSB. That is no technicality. Permitting law enforcement to obtain a warrant for one purpose but use it for another is exactly what the Framers sought to prevent with a Constitution that proscribes general warrants. *Berger*, 388 U.S. at 59. As has been repeatedly documented, general warrants permitted the Crown's officers to take any action necessary to investigate a crime. The Fourth Amendment expressly declines to give the government such carte blanche. For this reason, too, the Central District magistrate should not have signed off on the Stingray.

### c. Probable cause aside, the warrant was facially overbroad and lacking particularity.

Probable cause is not the only problem. The warrant likewise lacked particularity. This problem is due not only to the inherent technological limits of the Stingray, but also to the lack of guardrails in the warrant itself to limit the information swept up in the search.

Consider the technical limits first. As explained above, Stingrays cast an inherently wide net. They are incapable of searching for one phone in particular—instead, Stingrays search every phone in their vicinity. "[C]ellular devices in the proximity of the device" have no choice but to

"transmit signals to the simulator." DOJ Guidance at 2. The phones must yield not only their location, but also their uniquely identifying International Mobile Subscriber Identity (IMSI) numbers. And when phones connect to the Stingray, they may disconnect from service, resulting in dropped calls. *See supra* at III.C.ii. Consequently, there is no way to cabin the reach of the Stingray's search once it is activated.

To mitigate this reality, judges considering Stingray warrants have imposed strict rules on when and where they can be used. One judge, for instance, limited the executing agents to activating the Stingray only in close proximity to where the defendant was known to be. *Tutis*, 216 F. Supp. 3d at 480. One Chicago magistrate rejected warrants lacking these geographic limitations, reasoning that "a warrant that allows the agent to turn on the cell-site simulator anywhere in the district would be . . . generally overbroad in that it would facilitate the collection of a vast amount of unrelated information." *See Matter of Use of a Cell Site Simulator*, 623 F. Supp. 3d at 895.

The warrant here had no such limits. In stark contrast to the Chicago magistrate's caution, the warrant here authorized searches "whether the Subject Telephone is located within this District, outside of the District, or both[.]" Ex. G at 5. It further "extend[ed] to any time of the day or night as required." *Id.*

The result was predictable: a dragnet search of San Diegans from Del Mar to Kearny Mesa. The Report of Investigation indicates that agents "initiated [the] cell simulator" around 10am on the morning of his arrest. Ex. H at 4. Three hours later, Mr. Dotson's phone "pinged" near the Interstate 5-Interstate 805 interchange. *Id.* The agents followed the trail to Kearny Mesa and back again to Del Mar before executing the vehicle stop. *Id.* Using the Stingray for this sustained period of time, on one of the busiest highways,

48

and in some of the densest areas of San Diego, inevitably resulted in an incalculable number of innocent third parties yielding their private data to the government.

The magistrate could have spared them this search. He could have limited the Stingray's use to areas in which the GPS signal pinged, such as the Del Mar Fairgrounds. He could have limited the time of day in which the Stingray could be used. And he could have narrowed the timeframe for the Stingray's use, rather than the blanket 45-day authorization requested by the agents.

To be sure, the warrant did include some facially limiting language. It instructed "[t]he individuals operating the cell-site simulator [to] use technology reasonably available to restrict the recording or decoding of electronic or other impulses to the dialing, routing, addressing and signaling information used in the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communication, and so as to ensure that the device is used with minimum interference with the services accorded to customers of such service." Ex. G at 3–4.

But this apparent limitation is illusory. Given the state of Stingray technology, there is no way "to ensure that the device is used with minimum interference with the services accorded to" third parties. *Id.* Indeed, the agents do not appear to have taken any steps to minimize the disruption— instead, they deployed the Stingray for hours in some of the most populous portions of San Diego. Ex. H at 4.

And the limiting language preceding that clause simply instructed the agents not to use the Stingray to listen to the contents of users' calls— something that would be flatly illegal unless authorized as a Title III

1   wiretap.[12] Regardless of what the agents actually listened to, there was no

2   way to tame the Stingray in such a way that did not result in the search and

3   seizure of bystanders' phone data.

4          Put simply, everyone was subject to search, anywhere and at any time.

5   So, for similar reasons articulated regarding the tower dumps, the Central

6   District magistrate's leeway resulted in a "general warrant" imbuing the

7   executing officers with excess discretion. *See supra* at section III.B.i.d. Since

8   "a warrant to search 'all persons present' for evidence of a crime may only be

9   obtained when there is reason to believe that all those present will be

10  participants in the suspected criminal activity[,]" the warrant application

11  here should have been denied. *Marks v. Clarke*, 102 F.3d 1012, 1029 (9th Cir.

12  1996), *as amended on denial of reh'g* (Feb. 26, 1997).

13      **D. Once arrested, Mr. Dotson never consented to the search of**
14      **his car, and could not voluntarily consent as a matter of law**
        **because of the coercive environment of the traffic stop.**

15      The Fourth Amendment violations continued after Mr. Dotson was

16  arrested. Specifically, the search of his car was not justified by his purported

17  consent, as claimed by Officer Day. Ex. H at 4. Mr. Dotson denies ever being

18  asked for his consent prior to the car's search, let alone giving it. Ex. K. And

19  in any case, the coercive setting of his arrest rendered any nominal consent

20  involuntary as a matter of law.

21      **i.   The body-cam footage shows that the officers entered Mr.**
22      **Dotson's car before they could have possibly asked for his**
        **consent.**

23      Take the factual dispute first. Extensive review of the body-worn

24  camera footage demonstrates that the officers began searching Mr. Dotson's

---

[12] Given the lack of discovery on how the Stingray was used, Mr. Dotson reserves the right to later raise a Title III challenge if subsequent evidence suggests that the Stingray was used to intercept the contents of Mr. Dotson's communications.

car well before Officer Day could have obtained his verbal consent. As a result, the alleged consent-based search could not have happened.

There is one complication in reviewing this footage: Officer Day is apparently the only officer on the scene not wearing a body-worn camera. As a result, it is necessary to monitor his movements through piecing together the cameras of other officers who did activate their cameras.

In that footage, Officer Day appears early on. In Exhibit I, he can first be seen at the four minute and four second mark, wearing a gray Muhammed Ali sweatshirt and shouting orders at Mr. Dotson. He did so until Mr. Dotson was handcuffed, approximately six minutes into the footage. At that point, Officer Day's attention turned toward Mr. Dotson's passenger, Leticia Duvall. Like he did with Mr. Dotson, Officer Day shouted orders at Ms. Duvall until she was in handcuffs as well. Ex. J at 3:55–4:30.

After Ms. Duvall's arrest, Officer Day focused on the now-unoccupied car. He can be heard discussing their approach to the car with his on-the-scene partners. Ex. I at 7:43-7:54. He then led six officers to "clear" the car. Ex. I at 7:45–8:25. In doing so, the officers opened the car's trunk and doors and looked inside. *Id.* at 8:25–8:59.

All of this happened before Officer Day could have meaningfully spoken to Mr. Dotson. Accordingly, Mr. Dotson did not give "verbal consent" to search his car as claimed in the Report of Investigation. If the government disputes this fact, Mr. Dotson requests an evidentiary hearing on this issue.

**ii.    Voluntary consent was impossible as a matter of law because Mr. Dotson was surrounded by officers with their guns drawn and dog barking, separated from his partner, and handcuffed in a squad car.**

Even if Officer Day had asked Mr. Dotson's permission, he could not have obtained valid consent under the circumstances. This is true because of the overwhelmingly coercive environment created by law enforcement's

1    treatment of Mr. Dotson, despite his cooperation.

2         Of course, police need neither a warrant nor probable cause to search if

3    they have the owner's consent to do so. *United States v. Chan-Jimenez*, 125

4    F.3d 1324, 1326 (9th Cir. 1997). This consent, however, must be "freely and

5    voluntarily given." *Id.* at 1326. The government bears a "heavy burden" to

6    demonstrate as much." *Id.*

7         Courts look to five non-exhaustive factors to determine whether consent

8    is voluntary: "(1) whether the [consenting individual] was in custody; (2)

9    whether the arresting officers had their guns drawn; (3) whether Miranda

10   warnings were given; (4) whether the [consenting individual] was notified

11   that she had a right not to consent; and (5) whether the [consenting

12   individual] had been told a search warrant could be obtained." *United States*

13   *v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (alterations in original).

14        Here, four of these factors favor Mr. Dotson:

15        • First, there is no question that he was in custody—he was

16           handcuffed and held in the back of a police car, separated from his

17           partner, Ms. Duvall. He was under full-blown arrest, not merely

18           *Terry* stopped.

19        • Second, he had at least five guns drawn on him during the

20           encounter, all of which were still drawn by the point officers

21           opened his trunk. The threat of these weapons was compounded

22           by the explicit threat to have him bitten by the canine handler's

23           dog if he did not comply with the police. As seen on the body-worn

24           footage, the dog had no apparent reservations on following

25           through on this threat.

26        • Third, Mr. Dotson was not Mirandized, despite being placed

27           under formal arrest. The *Miranda* warnings came hours later,

28           once Officer Day and Agent Gillis began his stationhouse

interrogation.

- Fourth, Mr. Dotson was not informed that he had a right to refuse any search. Indeed, footage demonstrates that the search began without officers seeking his input at all.

On these facts, the Ninth Circuit's decision in *Chan-Jimenez* controls. 125 F.3d 1324. In that case, the officer approached a defendant who appeared to be having car trouble. *Id.* at 1325. After reviewing the defendant's license and registration, the officer asked if he could look under the truck's tarp. *Id.* The officer kept his gun holstered, but rested his hand upon it while speaking to the defendant. *Id.* His resulting consent was involuntary. *Id.* at 1327.

Mr. Dotson's case is even clearer. Unlike Mr. Chan-Jimenez, Mr. Dotson was the subject of a full-blown arrest, not just a *Terry* seizure. And unlike Mr. Chan-Jimenez, the officers in Mr. Dotson's case did not just put their hands on their guns—instead, they drew an arsenal's worth of weapons and pointed them straight at Mr. Dotson. Any reasonable person in Mr. Dotson's position would have interpreted a request to search "essentially as a command to allow a search." *Id.*

More recent authority is in accord. In *Liberal v. Estrada*, for instance, the Ninth Circuit found consent involuntary where seven officers surrounded the plaintiff during a traffic stop, handcuffed him, and then obtained his verbal consent. 632 F.3d 1064, 1083 (9th Cir. 2011). In reaching this holding, the Ninth Circuit specifically noted that "Plaintiff still had not been told why he was pulled over, and he was surrounded by seven police officers, some of whom were actively searching the area around his vehicle" when they secured his consent. *Id.*

Just so here. Like in *Liberal*, Mr. Dotson was never told why he was stopped until much later. As a result, Mr. Dotson was numb with panic. Ex. K. He saw that Ms. Duvall was arrested and began to worry for her sake as

well as his own—he thought there had been some sort of mistake. *Id.* And like in *Liberal*, Mr. Dotson was vastly outnumbered by the officers, several of whom were searching the area surrounding his car, including inside the trunk. For this reason, too, any "consent to the search of his car was not voluntary." *Liberal*, 632 F.3d at 1084.

### E. The warrants to search Mr. Dotson's cell phones were facially invalid because they relied on the habits of drug-dealers rather than robbers and authorized years of data seizure without meaningful limits.

There is a final Fourth Amendment infirmity here. The warrant application to search Mr. Dotson's cell phones was lacking on its face for two reasons.[13] First, Agent Gillis never even attempted to articulate how Mr. Dotson's phones would likely contain evidence of robbery—instead, he (likely mistakenly) relied upon his experience investigating drug dealers to justify the proposed warrant. And second, the warrant authorized years' worth of phone data without any meaningful limits, rendering it irredeemably overbroad.

### i. Agent Gillis offered no reason to believe that robbers store evidence on their cell phones.

The first error appears borne of a copy-paste mistake. In applying for the phone warrant, Agent Gillis seems to have copied in large part from prior warrant applications in this case. He wrote the facts in support of probable cause to mirror those in the Stingray application, for instance. Ex. M at 9–11. He added a few paragraphs at the end to reflect the apprehension of Mr. Dotson and the seizure of the phones. *Id.* at 12.

Based on these allegations, Agent Gillis claimed probable cause to

---

[13] For the reasons articulated *supra*, Mr. Dotson submits that the facial recognition and tower dump evidence should be stricken from the phone warrant as well as the Stingray warrant. He will not repeat that argument here. *See supra* at III.C.iii.a.

accuse Mr. Dotson of mail theft, assault, robbery of government property, robbery of a postal employee, conspiracy to interfere with commerce by robbery, brandishing a firearm during a crime of violence, general conspiracy, and being a felon in possession of ammunition. *Id.* at 13. So far, so good.

But probable cause to charge someone with a crime does not equate to probable cause to search their belongings. Rather, a search warrant affidavit must establish a "nexus . . . between the item to be seized and criminal behavior." *Warden,* 387 U.S. at 307. In other words, "probable cause must be examined in terms of cause to believe that the evidence sought will aid in a *particular* apprehension or conviction," and not just whether agents might find evidence of something criminal. *Id.* (emphasis added).

Agent Gillis failed to meet that standard here. Rather than explain why a robber or ammo-owner would store evidence on his phone, Agent Gillis instead focused on drug dealers. He claimed expertise in "narcotics and gang investigations" and participation in multiple related assignments. *Id.* at 7. He explained that "it is a common practice for individuals involved in the distribution of controlled substances" to use cell phones as part of their work. *Id.* at 7–8. Accordingly, "conspiracies involving the manufacture and distribution of controlled substances generate many types of evidence" to be found on the dealers' phones. *Id.* at 8.

Nowhere in this application did Agent Gillis explain how robbers use phones. As a result, there was no articulated nexus between Mr. Dotson's phones and the offenses for which the agent claimed probable cause. Without more, the warrant must fall.

The Ninth Circuit has ordered suppression in less egregious circumstances. For example, the court in *United States v. Weber* considered a warrant application seeking evidence of child pornography at the

defendant's home. 923 F.2d 1338 (9th Cir. 1990). The defendant there was suspected of possessing child pornography, but not of hands-on molestation. In justifying this search, however, the affiant offered "a general description of the proclivities of pedophiles" and their tendency to stash evidence at home. *Id.* at 1340.

The Ninth Circuit rejected this warrant. To the court, it was clear that "the 'expert' portion of the affidavit was not drafted with the facts of this case or this particular defendant in mind." *Id.* at 1345. While agents may have had a substantial basis to believe Weber was interested in child pornography, "there was not a whit of evidence in the affidavit indicating that Weber was a 'child molester.'" *Id.* For this reason, the agents' reliance on this warrant was objectively unreasonable. *Id.* at 1346.

The same is true here. Agent Gillis's musings on the habits of drug dealers had no rational connection to the evidence-storing habits of robbers. Like in *Weber*, "there was not a whit of evidence in the affidavit indicating that" Mr. Dotson was selling drugs, let alone that potential drug sales would shed light on the offenses actually enumerated in the warrant application. *Id.* at 1345. And even if the warrant's target offenses had included drug distribution, Mr. Dotson's marijuana-related past convictions could not suffice for present-day probable cause. *United States v. Perkins*, 850 F.3d 1109, 1120 (9th Cir. 2017). No reasonable officer or magistrate could think otherwise.

### ii. The resulting warrant was grossly overbroad, lacked particularity, and amounted to a general warrant.

Probable cause aside, the warrant itself was defective in form as well as substance. This is true because it authorized the seizure of all data on Mr. Dotson's phones for a years-long period divorced from the timeline of the robberies. As a result, it fails the Fourth Amendment's breadth and

particularity demands.

A warrant is "particularly susceptible to being overbroad when it authorizes the search and seizure of electronically-stored information." *United States v. Roberts*, 430 F. Supp. 3d 693, 717 (D. Nev. 2019) (citing *United States v. Flores*, 802 F.3d 1028, 1044–45 (9th Cir. 2015)). As the Supreme Court observed in *Riley*, a cell phone's contents "would typically expose to the government far more than the most exhaustive search of a house." 573 U.S. at 397.

Given the sheer breadth of information available on digital devices, the Ninth Circuit has cautioned courts to "exercise 'greater vigilance' in protecting against the danger that the process of identifying seizable electronic evidence could become a vehicle for the government to gain access to a larger pool of data that it has no probable cause to collect." *United States v. Schesso*, 730 F.3d 1040, 1042 (9th Cir. 2013) (quoting *United States v. Comprehensive Drug Testing*, 621 F.3d 1162, 1177 (9th Cir. 2010) (en banc) (per curiam)).

With this view in mind, "[d]istrict courts nationwide have begun expressing concerns about over-searching [electronically stored information], especially because warrants often authorize the government to seize large quantities of personal information that it lacks probable cause to search." *United States v. Lofstead*, 574 F. Supp. 3d 831 (D. Nev. 2021); *United States v. Deschambault*, No. 2:19-cr-00187- JAW-1, 2020 WL 5637659, at *9 (D. Me. Sept. 21, 2020) ("[T]he over-seizure concern addresses the risk that in search electronic devices, the government will 'gain access to information it has no probable cause to collect.'") (quoting *Comprehensive Drug Testing*, 621 F.3d at 1177); *United States v. Hulscher*, No. 4:16-cr-40070-01-KES, 2017 WL 1294452, at *6 (D.S.D. Feb. 10, 2017) ("But because of the very breadth given the seizure of electronic data on the front end, police and courts know the

seizure will in all reality contain a great deal—perhaps the overwhelming majority—of data which is nonresponsive to the reasons giving rise to probable cause for the search warrant in the first place."). It is therefore crucial to include "appropriate limitations within a warrant . . . to prevent a search 'from turning into a general dragnet.'" *Lofstead*, 574 F. Supp. 3d at 839 (quoting *Flores*, 802 F.3d at 1045).

In assessing the legality of a warrant to search electronic devices, the Ninth Circuit has instructed courts to consider three factors: (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available. *Flores*, 802 F.3d at 1044 (quoting *United States v. Lei Shi*, 525 F.3d 709, 731–32 (9th Cir. 2008)).

None of the Flores factors were met here, because the warrant (a) lacked adequate temporal limitations, (b) lacked objective standards limiting search of content on the phone, and (c) authorized search and seizure of evidence of offenses beyond the scope of probable cause.

### a. The warrant lacked adequate temporal limits.

The first and third *Flores* factors—that is, whether probable cause extended to all seized items, and whether the items could have been described more "particularly"— both weigh heavily in favor of suppression here. *See Flores*, 802 F.3d at 1044. The warrant lacked sufficient temporal limitations, allowing the government to search almost two years of phone data without restriction. Ex. N at 4 (authorizing the seizure of data starting January 1, 2021 and ending June 2, 2022). The government thus seized millions of records spanning eighteen months, including text messages, call

logs, device events, voicemails, photographs, geolocation data, and so on.

The affidavit did not establish that Mr. Dotson was engaged in a crime that took him years to commit. It instead accused him of engaging in two robberies and one instance of ammo possession. It provided no specific reasons to believe that additional evidence would be found before or after the dates of those offenses—let alone in January of 2021, almost a year before the first robbery.

District courts have not hesitated to declare such warrants invalid and order suppression. For instance, in *Lofstead*, the district court addressed a similar warrant and ordered suppression because the warrant there, like the one here, lacked adequate temporal limits. 574 F. Supp. 3d at 848. There, the government obtained a warrant to search the defendant's smartphone to look for evidence of child pornography and sex trafficking. *Id.* at 838. The warrant authorized the seizure of "any and all" evidence of these offenses "but did not include a temporal limitation on materials to be searched." *Id.* The defendant argued that the lack of temporal limitation converted the warrant into a general warrant. *Id.* at 842.

The district court agreed. Although recognizing that "[t]emporal restrictions are not a de facto requirement" in some cases where such restrictions would "serve no limiting purpose," the court explained that "there is no justification for an unrestricted search" when the government has "very precise knowledge of the date and time" of when the offenses occurred. *Id.* at 844. Because the government "knew exactly when the phone was used to commit the target offense and could tailor . . . the search" to that period, the court explained, the warrant should have been limited to searching within that "very limited window of time." *Id.* at 843. But because the warrant authorized a search of everything, the court held that it was "impermissibly overbroad." *Id.*

So too here. To be sure, the Dotson warrant did have an eighteen-month limit on its scope rather than no limit at all, unlike *Lofstead*. This limit, however, was not remotely tailored to the timeframe in which Mr. Dotson was suspected of criminal activity. He was suspected of a robbery in October 2021, a robbery in January 2022, and possessing ammunition in June of 2022. Combing through his personal, intimate information for the ten months preceding the first robbery grossly exceeded the scope of this suspicion. Just as in *Lofstead*, the government "knew exactly when [Dotson] commit[ted] the target offense[s] and could tailor . . . the search" to that "very limited window of time." *Id.* at 843. The eighteen-month limitation thus does not save the warrant.

### b. The warrant contained no meaningful limits on what was subject to seizure.

The type of data subjected to seizure, too, was essentially limitless. *Flores* requires the court to consider whether "the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not." *See* 802 F.3d at 1044. The warrant here did not include these standards.

Attachment B, for instance, authorized "the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below." Ex. M at 3. The file types subject to seizure were "electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 1, 2021, up to and including June 2, 2022." *Id.* Put simply, every aspect of the phone was subject to search and every conceivable item was subject to seizure. This list is so generic that it is meaningless. It ultimately gave the investigators unfettered and

1

unrestricted access to the entirety of the phone.

2

This court should decline the government's invitation to collect such

3

broad, "numerous," and "unspecific," lists of information because it, in effect,

4

"create[s] an unrestricted 'dragnet' search." *See Lofstead*, 802 F.3d at 844

5

(quoting *Flores*, 802 F.3d at 1045). When paired with the threadbare

6

temporal restriction, the warrant "can reasonably be read to authorize a

7

search of all photos, all videos, all text messages, all emails, all voicemails,

8

all in-going and outgoing calls, all internet search histories, and all social

9

media messages, potentially going back" far beyond the inception of any

10

crime. *Id.* Without a stricter guiding principle or search protocol, this fails

11

under *Flores*.

12

**c. The warrant added an uncharged offense without explanation or probable cause.**

13

The final *Flores* factor also favors Mr. Dotson. Specifically, because the

14

warrant also authorized the search and seizure of evidence of mail theft, but

15

nothing in the affidavit supported the view that Mr. Dotson committed this

16

offense.

17

When considering probable cause, courts "cannot 'mechanically reason

18

that some implies more.'" *United States v. King*, 985 F.3d 702, 709 (9th Cir.

19

2021) (quoting *Weber*, 923 F.2d at 1344). A reasonable belief "that some

20

incriminating evidence will be present at a particular place does not

21

necessarily mean there is probable cause to believe that there will be more of

22

the same." *Weber*, 923 F.2d at 1344.

23

Here, the affidavit contains no evidence that Mr. Dotson stole mail. The

24

proffered evidence instead only supported the notion that he stole the

25

mailwoman's property. But the application requested permission search for

26

evidence of this separate crime anyway. Ex. N at 5 (listing mail theft as a

27

subject offense). As a result, the warrant authorized the seizure of pieces of

28

evidence beyond those "limited by the probable cause on which the warrant [was] based." *Towne*, 997 F.2d at 544. The warrant was thus overbroad, failing each of the *Flores* factors. For this reason, too, the contents of the phone should be suppressed.

## IV.   **CONCLUSION**

For the foregoing reasons, Mr. Dotson's motion should be granted. Additionally, he requests an evidentiary hearing on any material disputes of fact that the government may raise.

Respectfully submitted,

DATED: July 17, 2023           */s/ Theo Torres*
_____
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Dotson
Email: Theo_Torres@fd.org